ATLANTIC TRUST CO. v. WOODBRIDGE CANAL & IRRIGATION CO. et al. (THOMPSON et al., Interveners).

(Circuit Court, N. D. California. August 9, 1897.)

No. 11,950.

1. TRUST DEED—SUSPENSION OF POWER OF ALIENATION.

A mortgage or deed of trust to secure bonds of a corporation does not suspend the absolute power of alienation of the property covered, and is not in contravention of Civ. Code Cal. § 715, which inhibits the suspension of the power of alienation for a longer period than the continuance of the lives of persons in being at the creation of the limitation.

2. IRRIGATION COMPANY—CLAIMS FOR SERVICES AND MATERIALS—PRIORITY OVER MORTGAGE.

Claims against an irrigation company for work and material furnished in the operation of the company's business, and which were essential to its operation and to the preservation of its property, are preferred, on the appointment of a receiver, over a prior mortgage of the company's property.

3. SAME.

Claims against an irrigation company for services and material furnished in the construction of an extension which was not necessary to preserve the property of the company, or to keep it in operation, are not entitled to preference over a prior mortgage of the company's property.

4. MECHANIC'S LIEN—ATTORNEY'S FEES.

Where those whose claims for services and materials are given preference over a mortgage upon equitable grounds also base a claim of preference on the mechanic's lien law, such latter claim will not be considered, and compensation for attorney's fees, and expenses of proceedings to record the lien, will not be allowed.

5. IRRIGATION COMPANY—CLAIMS FOR SERVICES—PRIORITIES.

Claims for services rendered in the construction of an addition to an irrigation system, which was never completed or in operation, will not be preferred over a prior mortgage on the property of the irrigation company.

6. PLEDGED BONDS—SALE AT AUCTION.

Where the bonds of an irrigation company, pledged to secure claims against the company, are sold at public auction, and bought in by the pledgees, the latter are entitled to be paid the full value of the bonds, and not merely the amount for which they were pledged.

7. TIME CHECKS—LIMITATION OF ACTIONS.

Time checks given for services are evidences in writing of a liability, and claims founded thereon are not barred by Code Civ. Proc. Cal. § 339, subd. 1, which provides that an action upon a contract obligation or liability not founded upon an instrument in writing shall be commenced within two years.

8. WATER RIGHTS.

Water rights in an irrigation company, which are appurtenant to specific land, will be allowed, against the receiver of the company.

Scrivner & Schell and John B. Hall, for complainant.
Budd & Thompson and W. M. Cannon, for J. C. Thompson.
W. M. Cannon and Paul C. Morf, for Wm. Alloway, A. H. Cowell, E. Franklin, and others.
E. P. Cole, for Wm. C. Pidge, Buell & Co., and others.
O'Brien, O'Brien & O'Brien, for F. G. McClelland.
Cannon & Freeman and E. R. Thompson, for J. N. Castle.

MORROW, Circuit Judge. This case now comes up on a motion by the complainant, the Atlantic Trust Company, for a final decree of foreclosure, and an order of sale of the property of the Woodbridge Canal & Irrigation Company, covered by a certain mortgage or deed of trust executed by the defendant corporation to the complainant on July 17, 1891, to secure the payment of an issue of 100 bonds by said complainant to the Woodbridge Canal & Irrigation Company. The bill was filed October 3, 1894, and a receiver was appointed by the court on the same day. An amended bill was filed on December 16, 1895. On March 5, 1896, a rule was entered taking the bill pro confesso as to the defendant corporation. Evidence has been introduced showing that the defendant corporation defaulted in the payment of the bonds, both principal and interest. Six months' interest was due on September 1, 1894. Several interventions have been filed for preferential claims. Some of these have already been disposed of, and others have been partially considered. The important question is whether these claims are to be preferred to the mortgage lien or claims of the bondholders, and in what order they are to be marshaled. Before taking up the claims covered by such of the interventions as have not already been disposed of, it will be necessary to notice an objection which was urged at the hearing by counsel for certain interveners, to the effect that the trust deed is void. It is contended that the "deed of trust," as that instrument is entitled, is void as being in contravention with certain provisions of the Civil Code of the state of California, which inhibit the suspension of the power of alienation, by any limitation or condition whatever, for a longer period than during the continuance of the lives of persons in being at the creation of the limitation or condition. Civ. Code, § 715. See, also, sections 716, 749, 771, of the Civil Code. Subdivision 1 of section 857, Civ. Code, provides that express trusts may be created to sell real property, and apply or dispose of the proceeds in accordance with the instrument creating the trust. It is argued that the power to sell does not include the power to hold, and that, as in this case the power is to hold until the principal and interest become due, this is a virtual suspension of the power of alienation. It is sufficient reply to say that the mortgage or deed of trust involved in this case does not purport, either expressly or by implication, to suspend the absolute power of alienation of the property covered by the mortgage or deed of trust. Nor is the legal effect of the instrument such as to suspend the absolute power of alienation. It therefore cannot be said to contravene any laws of the state of California in this regard.

I now take up the several petitions in intervention. That of J. C. Thompson, who petitioned the court for the specific performance of certain contracts or scrip for water rights, has already been passed upon and rejected. See opinion filed March 15, 1897 (79 Fed. 501). I held that the specific performance of the contracts or scrip for water rights held by the petitioner J. C. Thompson would not be enforced, for the reasons, among others: (1) That the scrip was not superior to the mortgage lien; (2) that there was no land ap-

purtenant to the water rights claimed by the petitioner, in accordance with section 552 of the Civil Code; (3) that the scrip held by the petitioner, under which he claimed his water rights, was too indeterminate to be enforced by specific performance.

I next consider the claims for preference of William Alloway and many others, appearing for themselves, and as assignees for a large number of persons; said claims being for services rendered and materials furnished to the Woodbridge Canal & Irrigation Company. One petition is by A. H. Cowell, on behalf of himself, and as assignee for many others. In order to expedite proceedings, a stipulation of facts has been entered into by counsel, reserving the question as to whether or not, under the facts as stipulated, such claims can be preferred over the mortgage lien or claims of the bondholders. This stipulation of facts, entitled, "Stipulation of Facts on Cowell Petition and Other Petitioners for Preference," includes the claims of petitioners other than that of Cowell, and of those whom he represents as assignee, and it will therefore be necessary to ascertain who these other petitioners are. Originally, the following named, William Alloway, Salisbury & Vickory, John Lane, Fred Grohe, Theodore Caldwell, N. Densmore, James A. Griffin, George Faass, W. H. Williams, James Blakeley, E. Franklin, Samuel Estes, Edgar Wyant, Joseph J. Hinckley, H. H. Saunders, and J. N. Hinckley, joined in a petition for preference, which they entitled "Bill of Complaint in Intervention," filed December 10, 1894. To this intervention demurrers were interposed, and on December 6, 1895, these were sustained as to some of the petitioners, and overruled as to others. Thereupon the following named, William Alloway, James Blakeley, Theodore Caldwell, George Faass, N. Densmore, W. H. Williams, Salisbury & Vickory (as partners), J. Lane, James A. Griffin, and Fred Grohe, each filed separate petitions for preference. It is their claims which have been included in the stipulation of facts relating to the Cowell petition, and they will be governed, therefore, by the same set of facts. The other remaining interveners, viz. E. Franklin, Samuel Estes, Edgar Wyant, Joseph J. Hinckley, H. H. Saunders, and J. N. Hinckley, joined together again, and filed what they have entitled a "Reformed Bill of Complaint in Intervention." With respect to their claims, a separate and different stipulation of facts has been entered into, as other considerations govern their claims. Their claims will therefore be considered separately from the other claims, although there are some general propositions of law which will apply equally to all of these claims for preference. With respect to the separate petitions filed by William Alloway and the others above specified, it is proper to state that another demurrer was interposed to their petitions, which was considered and determined by my predecessor, Judge McKenna. See opinion filed January 4, 1897 (79 Fed. 39). It was held by him that, so far as the services or materials were for the purposes of construction, they were not entitled to preference over the mortgage lien (Railroad Co. v. Hamilton, 134 U. S. 296, 10 Sup. Ct. 546); that, so far as they were for repairs and improvements, they could not be given preference, as there was no

allegation in the petition of diversion of income, or in fact of the receipt of any income; that, so far as they were for operating expenses,—keeping the works a going concern,—they were entitled to preference over the mortgage lien. This establishes the law of the case with reference to the nature of the claim which will be entitled to preference over the mortgage lien. The demurrer was overruled, and time given to answer, and subsequently the stipulation of facts referred to was filed. This stipulation describes the system of canals which the Woodbridge Canal & Irrigation Company was operating. It is stipulated that the company caused the work to be done and the services to be rendered, and that the same were performed, and that it bought and used the materials, goods, wares, and merchandise mentioned and set forth in the petitions of the several interveners, commencing about the month of November, 1893, and continuing up to about the month of October, 1894. It is further stipulated that the services rendered and materials furnished are of the value set out in the petition, and specified in the stipulation, and that no part of the same has ever been paid. The services rendered and materials furnished are divided by the stipulation into three general classes, viz.:

"(1) Expenses of operating the concern, and expenses claimed by petitioners to be necessary in keeping the system a going concern; (2) expense for work, services, materials, and supplies in connection with said extension work; (3) work, etc., on Upper Location."

All the services rendered and materials furnished under the first head should be allowed and be given preference, it being expressly stipulated that they were "essential to the preservation of said property, and necessary to keep said canals in proper working condition"; and it will be so ordered.

The services rendered and materials furnished, coming under the second head, are fraught with considerable difficulty. The stipulation shows that during the period before mentioned, viz. commencing from the month of November, 1893, and continuing up to about the month of October, 1894, the company extended its main canal and built main laterals and main branches, amounting in all to 14½ miles of canal, all of which, by the terms of said deed of trust, became subject to its provisions, although the deed of trust had been executed and delivered a long time prior to the inception and commencement of said extension work, or of any of said work, and prior to the time when any of said services were rendered, or materials, goods, wares, and merchandise were sold and delivered. The extension work is described in the stipulation. It is further stipulated that the services rendered and materials supplied in connection with said extension work were actual and necessary expenses for said work, but the question is expressly reserved:

"Whether or not said addition or extension work was essential to the preservation of said property, or was necessary to keep said system or irrigation works a going concern, or to make them a paying concern; the complainant insisting that said extension and addition work was not essential, either for the preservation of, or to keep in active operation, the canals and ditches existing when said extension and addition work was commenced."

It is difficult to understand, from the facts as they are stated in the stipulation, how this extension work was necessary to the preservation of the canals and ditches existing when the extension work was commenced. The showing is not strong enough to justify allowing these expenses on that ground. The next inquiry is, were they essential to keep the canal system a going concern? The stipulation of facts, in my opinion, does not set out facts sufficient to justify me in holding that this extension work was necessary to keep the entire or whole canal system a going concern. The deed of trust was recorded August 10, 1891, in San Joaquin county, state of California. The extension work was completed on or about May 5, 1894, but the stipulation shows:

That the "canal and ditches were not then in condition for actual use, for want of siphon connections at crossings of sloughs and highways therewith, and the extension of the east branch, from the Peters land to the Calaveras river, was in actual use and operation from the time of its completion to October 3, 1894; that prior to the extension of said main canal, and prior to the construction of said lateral canals and ditches, the business or irrigation system of the defendant the Woodbridge Canal & Irrigation Company was not a paying concern, for the reason and from the fact that the company's sales of water and water rights, and rentals from consumers of its water, through the then existing canals and ditches, were not sufficient to make said irrigation company a paying concern."

If it is to be inferred from this last stipulation that subsequent to the extension of said main canal, and subsequent to the construction of said lateral canals and ditches, the business or irrigation system of the Woodbridge Canal & Irrigation Company was placed upon a paying basis, it may be that the claims for these extension services and materials might be deemed to possess an equity superior to that of the bondholders, particularly in view of the subsequent broad stipulation "that all of said work performed, services rendered, and materials and other supplies furnished contributed largely to the advantage of the bondholders of the defendant corporation." But the question would seem to be disposed of by the decision of the supreme court in Thompson v. Railroad Co., 132 U. S. 68, 10 Sup. Ct. 29. In that case it was attempted, as in the case at bar, to have certain expenses for construction of some portion of a railroad made preferred claims to that of the bondholders under a prior mortgage. The principal facts are these, as stated in the opinion of the court:

"This suit was brought by holders of obligations of the Indiana, Cincinnati & Lafayette Railroad Company, and on behalf of other holders similarly situated, to enforce an alleged lien claimed by them upon earnings of a section of the road of the White Water Valley Railroad Company against the claim of priority of bondholders secured by an earlier mortgage. The White Water Valley Railroad Company was organized as a corporation in 1865, under the laws of Indiana, with authority to locate, construct, and operate a line of railway from Hagerstown, in Wayne county, of that state, to the town of Harrison, Dearborn county, on the boundary line between Indiana and Ohio. To raise the necessary means to construct the railway, the company issued its coupon bonds to the amount of $1,000,000, in sums of $1,000 each. They were dated August 1, 1865, and were to mature August 1, 1890, and draw interest at the rate of 8 per cent. per annum, payable semiannually. To secure the payment of the principal and interest of these bonds, the company executed to trustees, by way of mortgage, a deed, bearing date on that day, of its railroad, and all

the right of way and land occupied thereby, with the superstructure, and all property, materials, rights, and privileges then or thereafter appertaining to the road, and the benefit of all contracts with other railroad companies, then existing or thereafter to be made, and all property, rights, and interests under the same; the deed contained the usual covenants to execute suitable conveyances for the further assurance of property subsequently acquired, and intended to be included in the instrument. The company soon afterwards commenced the construction of the road, and by the 4th of November, 1867, completed that part of it which lies between the towns of Harrison and Cambridge City, leaving the distance from the latter place to Hagerstown—between seven and eight miles—unconstructed. It was then without the requisite means to equip the part of the road completed, or to undertake the construction of the remaining portion of the road. In this condition it entered into a contract of perpetual lease with the Indianapolis, Cincinnati & Lafayette Railroad Company (a corporation then in existence), in consideration of which the latter company agreed to furnish all the necessary equipments, material, and laborers to operate the line of the road then completed, and to construct and put in good and safe running order for the accommodation of the public that part of the line then uncompleted (that is, the section between Cambridge City and Hagerstown), and to pay to the lessor annually the sum of $140,000, in four quarterly payments, of $35,000 each."

The lessee proceeded and constructed the remaining portion of the road between Cambridge City and Hagerstown, and also furnished the necessary equipment to put the whole road in operation; in other words, the lessee made the road a going concern, and, having furnished the material and means for that work, issued its bonds to two persons named Smith and Lord who did the work. The supreme court, in passing upon a claim for preference for construction, said:

"The claims of the complainants, whatever validity and force may be given to them as liens upon the earnings of the section of road from Cambridge City to Hagerstown, between the parties agreeing to such liens, are entirely subordinate to the rights of the bondholders under the mortgage of the White Water Valley Railroad Company, executed for their benefit to trustees on the 1st of August, 1865. That mortgage was made before the claims of the complainants had any existence."

This decision would seem to dispose effectually of the claims for preference for the construction of the extension canal system involved in this case. See, further, Dunham v. Railroad Co., 1 Wall. 254; Kneeland v. Trust Co., 136 U. S. 97, 10 Sup. Ct. 950; 5 Thomp. Corp. p. 5647, § 7122; 19 Am. & Eng. Enc. Law, 761. As the matter now stands, I do not regard the stipulation of facts sufficient to justify me in holding that the claims for this extension work are superior to the mortgage lien or claims of the bondholders.

As to the claims coming under the third head, viz. "Work, etc., on Upper Location," I have no difficulty in finding, from the stipulation of facts, that the equity is inferior to that of the bondholders. They will therefore not be given preference.

The stipulation shows further that some of the persons who rendered services, etc., claim a lien under the mechanic's lien law of this state (section 1183 et seq., Code Civ. Proc.); and certain compensation for attorney's fees and costs of the proceeding to record and perfect the lien are asked to be allowed out of the proceeds of sale. It is significant that those of the interveners comprehended in this stipulation of facts, who originally claimed such a

lien, have made no such claim in the separate petitions subsequently filed by them. But, aside from this, whatever rights these interveners may have under the mechanic's lien law of this state, and whether or not this court will recognize and enforce such liens, is quite immaterial; for the allowance of expenses for services, etc., and giving them preference over the claims of the bondholders, is based upon the equitable ground that the nature of the services, etc., rendered, gives them an equity superior to that possessed by the bondholders. It will therefore be unnecessary to consider what rights some of these interveners may have under the mechanic's lien law, and the compensation for attorney's fees and expenses of proceedings to record the lien will not be allowed.

I now take up the claims of the other group of interveners, who joined together in what they term the "Reformed Bill of Complaint in intervention." As stated, a separate stipulation of facts has been filed with respect to their claims. Their names are as follows: E. Franklin, Samuel Estes, Edgar Wyant, Joseph J. Hinckley, H. H. Saunders, and J. N. Hinckley. I find, as appears by the stipulation of facts, that the services rendered by these interveners relate to certain property acquired by the defendant corporation February 8, 1894, in the county of Calaveras, state of California, called and known by the name of the "Upper Location," and previously referred to in connection with the petition in intervention of William Alloway and others. The services rendered appear to have been for the construction of a proposed line of canals and ditches extending from the system of the Woodbridge Canal & Irrigation Company. This proposed addition was never completed or in operation, and, being purely for construction, under the ruling of Judge McKenna, previously referred to, cannot be allowed as a preferred claim over the claims of the bondholders. Thompson v. Railroad Co., 132 U. S. 68, 10 Sup. Ct. 29; Railroad Co. v. Hamilton, 134 U. S. 296, 10 Sup. Ct. 546.

I next take up the claim of William C. Pidge for a preferred claim for certain services rendered between October 13, 1893, and October 1, 1894, as a civil engineer, and as assignee for certain other persons who claim to have rendered services. This claim now comes up on a motion by complainant to vacate the default entered by Pidge against it. It seems that Pidge's claim has been presented heretofore to my predecessor, Judge McKenna, and his claim allowed. The records of the court show that on June 24, 1895, Judge McKenna, in open court, ordered that the claim of Pidge be preferred. Subsequently, on December 16, 1895, an order was made that counsel for the complainant, the Atlantic Trust Company, might file a demurrer to the reformed bill of complaint in intervention, and to all petitions for preferred claims, except that of Pidge. For some reason or other, which is not very clear, no judgment was ever entered upon the order of court preferring Pidge's claim. I see no reason now why the order of Judge McKenna, preferring Pidge's claim, should not be adhered to; and his claim, in the sum of $1,801.37, will be allowed, and made a preferred claim, and it is so ordered.

The petition of Buell & Co. et al., interveners, has already been considered. In an opinion rendered by me on April 5, 1897 (79 Fed. 842), I held that these interveners were entitled to have 26 bonds held by them allowed out of the proceeds to be derived from the sale of the defendant corporation's property, with the other bonds, after the deduction of preferential claims. These bonds had been pledged to the interveners as security for certain materials furnished to the defendant corporation. I held that the interveners were entitled to be paid the amount pledged on the bonds. It is now claimed, however, that with respect to the bonds held by Buell & Co., one of the interveners, the full face value of the bonds should be allowed to them, as they were sold at public auction, in accordance with the terms of the bonds, and were bought in by Buell & Co. Without entering into a discussion of the question, it may be said that Buell & Co., having bought in the bonds held by them as pledge security, are entitled, under the decision of the supreme court in Wade v. Railroad Co., 149 U. S. 327, 13 Sup. Ct. 892, to the full face value of the bonds. See, also, Farmers' Loan & Trust Co. v. Toledo & S. H. R. Co., 4 C. C. A. 561, 54 Fed. 759, 774; Wheelwright v. Transportation Co., 56 Fed. 164. Therefore, so far as the bonds held by Buell & Co., and bought in by them, are concerned, they are entitled to be paid their par value of $1,000 each, provided the residue of the proceeds of sale, after the payment of preferential claims, is sufficient to pay in full all of the bonds now presented. If not, then they are entitled to be paid pro rata with the other bonds, and it is so ordered. The bonds held by the other interveners comprehended in Buell & Co.'s petition will simply be allowed the amount pledged.

I next take up the petition of F. G. McClelland, on behalf of himself and as assignee for others, claiming the aggregate sum of $922.12 for services rendered in keeping the canals in a proper state of repair. A separate stipulation of facts was filed with respect to these claims, in which it is stipulated:

"That the said labor, and the whole thereof, was used and employed, and was necessarily used and employed, on and between the said 1st day of April, 1894, and the said 3d day of October, 1894, by said corporation defendant, on, upon, and about the old canal of said corporation, and its appurtenances, for the purpose of keeping the ditches of said corporation defendant in full operation and repair; and said labor was not employed by said defendant corporation in the original construction of any of the works pertaining to, or belonging to, its said property." It is further stipulated that "said labor, and the whole thereof, was necessary to keep the said canals in a proper state of repair, and in working order, to deliver water to the customers of the said corporation."

The stipulation further sets out that the claims are evidenced by time checks, in writing, issued by said corporation defendant, the form of which is set out in the stipulation. The petition is demurred to by the complainant on the ground, chiefly, that the claims contained in this petition are barred by subdivision 1 of section 339, Code Civ. Proc., which provides, substantially, that an action upon a contract, obligation, or liability not founded upon an instrument of writing shall be commenced within two years.

The stipulation of facts shows that the corporation defendant became indebted to the petitioner and the others named in the petition from and after the 1st day of April, 1894, to and including the 3d day of October, 1894. If the limitation of two years is applicable to the claims presented, it is obvious that they are barred. But if, on the other hand, the time checks be regarded as evidencing a liability on the part of the defendant corporation to pay, then the right of the petitioner to sue is not barred until four years have elapsed; for section 337 of the Code of Civil Procedure provides, substantially, that an action upon any contract, obligation, or liability founded upon an instrument in writing executed in this state must be commenced within four years. It has been held that a receipt or acknowledgment, in writing, for money, showing upon its face a liability to account, is not barred by the statute of limitations until four years have expired. Ashley v. Vischer, 24 Cal. 322. An account with the words "Audited and approved, and certified to be correct," has been held to be within the four-years limitation. Sannickson v. Brown, 5 Cal. 57. I am therefore of the opinion that the claims contained in this petition are not barred by any statute of limitations, or by laches, inasmuch as the claims are evidenced by the time checks, which contain an admission of the company's liability, signed by its superintendent, and that, in view of the stipulation of facts entered into between the respective counsel as to the necessary nature of the services, they should be allowed in the sum agreed upon, viz. $922.12, and be made a preferred claim in that amount; and it is so ordered.

I next consider the petition of J. N. Castle for a water right. It comes up on an order to show cause why the petition of Castle should not be granted, and a demurrer by Buell & Co. to the petition. The rights of this petitioner, upon which he bases his application for a water right, differ from those set up in the petition of J. C. Thompson, who sought to obtain specific performance of certain scrip for alleged water rights. There it appeared affirmatively, among other matters, that the water rights claimed were not appurtenant to any land. See opinion, 79 Fed. 501. From the present petition it clearly appears that the permanent water right claimed is appurtenant to certain land which is specifically described in the petition. I see no reason why the prayer of the petition should not be granted, and the receiver will convey to the petitioner J. N. Castle the water right claimed; and it is so ordered.

This, I believe, concludes the consideration of the several petitions presented by the numerous petitioners in this litigation. I have assumed that the several stipulations of facts state correctly the amounts due. If they do not, counsel for the respective parties, when the decree is drawn up, can have an opportunity to see to it that the correct figures are set out. It appears that the complainant has presented exceptions to the receiver's report. The receiver has filed three reports up to date. The first was filed December 29, 1894; the second, January 31, 1895; and the third, August 14, 1896. It will be time enough to consider such objec-

tions as the complainant may have to these reports when the property has been sold, and the proceeds of sale have been returned into court. The reports indicate, at least approximately, the amounts spent and owing by the receiver in handling and preserving the property. I shall grant the motion for a final decree in favor of the complainant, and the application for an order of sale will be allowed; and it is so ordered.